**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS K. TURNER** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **v.** | : | |
| | : | |
| | : | |
| **MR. JESSE KIRSCH, et al** | : | **No. 08-2005** |

**MEMORANDUM OPINION**

**Goldberg, J.**                                                                     **April 12, 2010**

Plaintiff, Thomas Turner, initiated this civil rights action pursuant to 42 U.S.C. § 1983

(§ 1983) against various Defendants, alleging that he was denied necessary medical treatment while

incarcerated at the Berks County Correctional Facility, in Leesport, Pennsylvania. Before the Court

are the Motions for Summary Judgment of Defendants Paula Dillman-McGowan, Joetta Kline,

Cynthia Sheldon, Drue Wagner, Jesse Kirsch and Erik Von Kiel. (Doc. Nos. 74-75, 77.) For the

following reasons, we will grant summary judgment in favor of Defendants Kline, Wagner and

Kirsch, and deny summary judgment as to the remaining Defendants.

## I.    FACTUAL & PROCEDURAL HISTORY[1]

On April 29, 2006, Plaintiff injured his right ankle while walking on a basketball court

during a stoppage in play. Plaintiff described hearing an audible "pop," and was immediately taken

to the medical unit where he was examined by a nurse. Thereafter, on May 1, 2006, Plaintiff was

evaluated by Jesse Kirsch, a Physicians Assistant for PrimeCare Medical, Inc. (PrimeCare), the

_____

[1] Unless otherwise indicated, the facts discussed below are undisputed.

medical service provider for the Berks County Prison. Kirsch performed a "Thompson test" on Plaintiff's ankle, which was negative,[2] and noted that Plaintiff had a right ankle sprain and a possible Achilles tendon strain or partial tear. Kirsch ordered an x-ray of Plaintiff's right heel bone and wrapped his ankle in an ace bandage.[3] Kirsch also scheduled a follow-up appointment for May 5, 2006. Kirsch's treatment plan was reviewed and approved by Dr. Drue Wagner, who at the time, was the Assistant Corporate Director for PrimeCare and a resident physician. (Pl. State. Facts ¶ 13; Doc. No. 80, Ex. O at 827-28; Kirsch Depo. pp. 186-89.)

Plaintiff testified that he told Kirsch during their initial meeting that "it was more than a sprained ankle" and insisted on the second opinion of a doctor. According to Plaintiff, Kirsch responded "you don't know nothing, you haven't been to medical school." Plaintiff also testified that he informed Nurse Paula Dillman-McGowan that he believed his injury was more serious than initially diagnosed and that Kirsch told him he could not see the doctor. Plaintiff claims that Dillman-McGowan said "give it a couple of days and see if you see the doctor and if not address a sick call slip to me and I'll take care of it." (Turner Depo. pp. 68-69, 73.)

On May 4, 2006, an x-ray was performed on Plaintiff's ankle, which revealed "[n]o acute fracture." The x-ray report also included a note suggesting an MRI, "[i]f there is a concern regarding an Achilles tear and further imaging is required[.]" On the same day, Plaintiff filled out

_____

[2] Kirsch testified that he performed a "Thompson's test" to determine if Plaintiff had "a ruptured or completely torn Achilles." (Kirsch Depo. pp. 184-85); see (Wagner Depo. p. 34) (reflecting that the "Thompson Test is the test checking for the integrity of the Achilles tendon").

[3] He directed that his ankle should be wrapped for 28 days, and restricted Plaintiff to the "low bunk" within his cell and restricted "work/sports" for 28 days. Plaintiff, however, was housed in a one cell unit that did not have an upper bunk. (Doc. No. 80, Ex. R; Turner Depo. p. 83.)

a "sick call request," addressed to Dillman-McGowan, asking why he had not seen a "specialist like [she] said." The next day, Kirsch completed his follow-up examination of Plaintiff. Kirsch again performed a "Thompson test," which was negative, recommended that Plaintiff use ace wraps, ice and moist heat, and ordered pain medication. On May 15, 2006, Plaintiff filled out another "sick call request" asking Dillman-McGowan why he had not been evaluated by a specialist. (Doc. No. 80, Ex. O at 829, Q, S, T.)

On May 16, 2006, Kirsch again evaluated Plaintiff. He noted that Plaintiff was "doing well" and diagnosed him with a "resolving Achilles strain / partial tearing." Kirsch continued the initial treatment plan, prescribed him pain medication, and at Plaintiff's request, referred him to Dr. Erik Von Kiel for further evaluation. Later that day, Dillman-McGowan responded to Plaintiff's sick call request of May 15, 2006, noting that he was "seen by [Kirsch on] 5/16/06 [and] scheduled to see [a] physician [on] 5/17/06." However, for reasons not disclosed in the record, Plaintiff did not see Dr. Von Kiel on May 17, 2006 or over the course of the next twelve days. (Doc. No. 80, Ex. O at 829, 832, T.)

On May 29, 2006, Plaintiff submitted another sick call request, reflecting that his "back ache[d]" and his "leg [was] still swollen a little[, and that he] ache[s] all the time, Constantly!" He also noted that he had "not seen the Doctor yet." On May 31, 2006, Plaintiff was evaluated by a nurse "at sick call" and complained that his "foot [was] still hurting bad." (Doc. No. 80, Ex. O at 832, U.)

On June 1, 2006, Kirsch again directed that Plaintiff be "refer[ed] to Dr. Von Kiel" for a second opinion regarding his right "achilles / Ankle (? Partial tear)[.]" Kirsch also discontinued Plaintiff's prescription for "Motrin" and prescribed another medication. On June 5, 2006, Dr. Von

Kiel evaluated Plaintiff, and ordered another x-ray. On June 12, 2006, upon receipt and review of the x-ray report, Von Kiel diagnosed Plaintiff as having a "[p]artial Achilles tendon tear vs. earlier [fracture]" and referred Plaintiff to outside orthopedic specialist, Dr. Zeferino Martinez. (Doc. No. 80, Ex. O at 828-29, 831-32; Kirsch Depo. pp. 266-69; Von Kiel Depo. p. 94.)

Dr. Martinez evaluated Plaintiff, at his office, on June 21, 2006, and diagnosed him with "what appears to be a partial tear" of his right Achilles tendon. Martinez prescribed a brace to immobilize Plaintiff's ankle, an MRI and pain medication. Later that day, Plaintiff met with Dillman-McGowan for a follow-up appointment and she filled out the necessary paperwork to provide Plaintiff with the prescribed brace and MRI. (Doc. No. 80, Ex. O at 831, V, W; Dillman-McGowan Depo. pp. 78-83; Turner Depo. p. 111; Pl. State. Facts ¶ 30.)

Cynthia Sheldon, Health Services Administrator for PrimeCare, was responsible for ordering medical devices, such as the cast brace prescribed by Dr. Martinez. Sheldon testified that when she informed Dr. Von Kiel that the brace was only available through a "specialty" supplier, he told her not to order the brace as he would "take care of it." Sheldon explained that at Von Kiel's direction, she did not order the brace. (Pl. State. Facts ¶ 5; Sheldon Depo. pp. 73-74, 129-30.)

On July 3, 2006, Plaintiff received an MRI of his right ankle which revealed a "rupture" of his right Achilles tendon. On the same day, Dr. Von Kiel noted that Plaintiff should "use [the] brace-device currently available for inmate here now." The next day, Kirsch reviewed the MRI with Plaintiff. He also recommended that Plaintiff be moved to the lower tier of his prison unit, ordered him medication and referred him to Dr. Martinez for a follow-up visit.[4] Dr. Von Kiel reviewed

---

[4] Office clerk, Joetta Kline, originally scheduled Plaintiff to see Dr. Martinez on July 17, 2006, but "due to transportation," rescheduled the appointment for July 24, 2006. (Pl. State. Facts ¶¶ 36-37.)

Plaintiff's treatment on July 17, 2006, and made reference to the "brace" prescribed by Dr. Martinez. He testified that it appeared that PrimeCare was still trying to locate a brace for Plaintiff at this time. (Pl. State. Facts ¶¶ 33-34; Doc. No. 80, Ex. Z, O at 834-36; Von Kiel Depo. p. 133.)

On July 24, 2006, Plaintiff was evaluated by Dr. Martinez. He concluded that Plaintiff's Achilles tear was "chronic" and that "[c]ertaintly at this point it is too late to put him in a brace and/or cast." He noted that Plaintiff could either choose to have the tendon surgically repaired or "accept it as simply a limitation that he has at the present time." Dr. Martinez concluded that surgical repair would be very difficult, since the injury was now "2 ½ months old[,]" and recommended that he be referred to a foot and ankle specialist if he decided to pursue surgery. (Doc. No. 80, Ex. AA.)

On July 26, 2006, Dr. Von Kiel placed an order moving Plaintiff to the medical unit where he could be issued crutches. He also referred Plaintiff to Dr. Thomas Shannon of Berks Foot & Ankle Surgical Associates, who evaluated Plaintiff on August 2, 2006. On August 3, 2006, Dr. Von Kiel discontinued Plaintiff's move to medical housing and, therefore, effectively rescinded his prescription for crutches, which are not permitted in the prison's general housing unit.[5] On the same day, Dillman-McGowan evaluated Plaintiff in his cell. Plaintiff testified that he asked her about the brace prescribed to him by Dr. Martinez and she told him that "it wasn't her job to give to [him], but she agreed well you do need a brace, but she said when you get it, you'll get it, try to

---

[5] There is some dispute as to why Plaintiff's move to the medical unit was discontinued. Compare (Kirsch Depo. p. 295) (Plaintiff refused crutches or medical housing); (Sheldon Depo. p. 130) ("[Plaintiff] refused to come to medical"); (Von Kiel Depo. p. 145) (Plaintiff might have refused a crutch, brace or "a certain element of the plan") with (Turner Depo. pp. 121, 173) (Plaintiff did not understand the notation discontinuing his move to the medical unit, and claims that he "never refused crutches, a cane or a wheelchair").

hang in there." Plaintiff did not, however, receive a brace or any other similar device. (Doc. No. 80, Ex. O at 837, EE; Pl. State. Facts ¶¶ 39, 42; Turner Depo. p. 114.)

On August 24, 2006, Dr. Shannon's office faxed a letter to the prison, setting out the costs for surgical repair of Plaintiff's Achilles tendon and noting that Dr. Shannon "was looking at a tentative date of 9/13/06" for the surgery. PrimeCare did not respond to the fax, and on September 12, 2006, Dr. Shannon sent a letter to the prison referencing Plaintiff's surgery. Also on this date, Plaintiff addressed a grievance form to Cynthia Sheldon, claiming that he had received "inadequate medical treatment" and was being denied surgery. Plaintiff testified that Sheldon came to his cell and told him that he would receive the treatment that he needs, but "she's having financial problems and she's finding it difficult to find someone, a specialist, . . . that's willing to operate on an inmate." He also testified that she said he would "be placed in the hole for harassment" if he continued to submit such complaints. (Doc. No. 80, Ex. DD, EE, FF; Turner Depo. p. 150.)

Plaintiff was scheduled to receive surgery on September 28, 2006.[6] On September 26, however, he left on a writ to Chester County and did not return until October 6, 2006. His surgery was rescheduled and ultimately performed by Dr. Shannon on November 1, 2006. After surgery, Plaintiff was moved to the medical unit where he received crutches and a wheelchair. (Doc. No. 80, Ex. O at 842-44.)

On November 14, 2006, Plaintiff was transferred to SCI – Graterford. After the move, he began physical therapy, which he apparently continued throughout most of 2007. Plaintiff claims

---

[6] Plaintiff submitted another grievance form on September 18, 2006, complaining of PrimeCare's failure to schedule his surgery. In a response on September 20, Plaintiff was told that he was scheduled for surgery. It appears, however, that his surgery was not actually scheduled until September 22, 2006. See (Doc. No. 80, Ex. O at 842, GG.)

that his condition did not improve. On November 12, 2007, Plaintiff underwent a second surgery to fully repair his Achilles tendon. (Pl. State. Facts ¶¶ 54-57) (reflecting second Achilles surgery was performed by Dr. Dane Wukick of the University of Pittsburgh).

## II.    SUMMARY JUDGMENT STANDARD

According to Federal Rule of Civil Procedure 56(c), summary judgment is proper "if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. A "[p]laintiff cannot simply reassert factually unsupported allegations in his pleadings." Poles v. St. Joseph's Univ., 1995 WL 542246 at *5 (E.D.Pa. Sep. 11, 1995) (citing Celotex, 477 U.S. at 325).

## III.    DISCUSSION

Pursuant to 42 U.S.C. § 1983, a plaintiff must demonstrate that his or her federal constitutional or statutory rights were violated by a person acting under the color of state law. See Kost v. Kozakiewitz, 1 F.3d 176, 184 (3d Cir. 1993). Plaintiff claims he was deprived of his Eighth Amendment right to receive adequate medical treatment while incarcerated at the Berks County

7

Prison. Defendants move for summary judgment, asserting that Plaintiff has not adduced evidence which would allow a reasonable factfinder to conclude that they violated his constitutional rights.[7]

The Eighth Amendment's prohibition of cruel and unusual punishment imposes a duty upon prison officials to provide prisoners with humane conditions of confinement, including adequate medical treatment.[8]  See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); Wood v. City of Lancaster, 2009 WL 80306 at *15 (E.D.Pa. Jan. 13, 2009).  A prison official's medical treatment of a prisoner, or lack thereof, will only give rise to a constitutional violation where: (1) the prisoner is suffering from "a serious medical need[;]" and (2) the prison official's acts or omissions demonstrate "deliberate indifference" to that need.  See Montgomery v. Pinchak, 294 F.3d 494, 499 (3d Cir. 2002).  Acts of negligence or medical malpractice, without more, are insufficient to support a constitutional violation.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  However, the fact that a prison official provides an inmate with some form of medical treatment does not necessarily absolve the official of liability under the Eighth Amendment.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

---

[7] Defendants do not dispute that they were operating under the color of state law in connection with this case.  See West v. Atkins, 487 U.S. 42, 54 (1988) (holding that physician under contract with state prison to provide medical treatment to inmates acts under the color of state law); Lassiter v. Kulp, 1993 WL 364694 at **1, 3 (E.D.Pa. Sep. 13, 1993) (acknowledging that other medical professionals under contract with the state, such as nurses, act under color of state law).  Cf. Spruill v. Gillis, 372 F.3d 218, 236-37 (3d Cir. 2004) (accepting that § 1983 claims could extend to non-medical prison officials, such as those who assist prison physicians, provided there is evidence that the officials have reason to believe medical personnel are mistreating an inmate).

[8] The rights afforded by the Eight Amendment apply to the states through the Fourteenth Amendment, Due Process Clause.  Hutto v. Finney, 437 U.S. 678, 685 (1978).

## A. Serious Medical Need

A prisoner's medical need is sufficiently "serious" where, for example, it "has been diagnosed by a physician as requiring treatment or . . . is so obvious that a lay person would easily recognize the necessity of a doctor's attention." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987). A medical condition may also be considered serious when, due to a delay in treatment, the prisoner experiences the "unnecessary and wanton infliction of pain" or life-long disability. Id. (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)).

In light of this standard, we have no difficulty concluding that Plaintiff's injury is sufficiently severe to allow a reasonable jury to conclude that he had a serious medical need. His condition – a torn Achilles tendon – was diagnosed by a physician and required a course of treatment that eventually necessitated two surgeries. See (Doc. No. 80, Ex. O, Y, AA; Pl. State. Facts ¶¶ 54-57.) Further, a medical condition "which threatens a plaintiff's ability to walk, even on a non-permanent basis, falls within the ambit of a serious medical need." Taylor v. Plousis, 101 F.Supp.2d 255, 262 (D.N.J. 2000); see also Petrichko v. Kurtz, 117 F.Supp.2d 467, 470 (E.D.Pa. 2007) (holding dislocated shoulder sufficient); Miller v. Hoffman, 1998 WL 404034 at *4 (E.D.Pa. Jul. 7, 1998) (elbow injury sufficient).

## B. Deliberate Indifference

The central issue before us is whether there are sufficient facts to establish that any of the Defendants acted with deliberate indifference.

A prison official acts with deliberate indifference if he or she "knows of and disregards an excessive risk to inmate health and safety." Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This is a subjective

standard of liability, consistent with "recklessness as the term is defined in criminal law." Nicci v. Morra, 212 F.3d 798, 811 (3d Cir. 2000). Thus, it is insufficient for the official to merely be "aware of facts from which the inference can be drawn that a substantial risk of serious harm exists[.]" Farmer, 511 U.S. at 837. The official must actually know of the risk. Id.

The Court of Appeals for the Third Circuit has recognized that deliberate indifference may exist in a variety of circumstances, including where a prison official: (1) denies a prisoner's reasonable requests for treatment, and "such denial exposes [him or her] 'to undue suffering or the threat of tangible residual injury,'" Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004) (quoting Lanzaro, 834 F.2d at 346); (2) knows of a prisoner's need for treatment but refuses to provide it, Durmer v. O'Carroll, 991 F.2d 64, 67-69 (3d Cir. 1993); (3) delays necessary medical treatment for non-medical reasons; (4) prevents a prisoner from receiving needed or recommended medical care; or (5) persists in a course of treatment which results in continued pain and the risk of permanent injury. See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999) (collecting cases).

Defendants claim that Plaintiff received a continuous course of treatment for his injury and that any alleged mis-diagnosis, improper treatment plan or administrative failure, while arguably negligent, fails to raise a fact question under the Eighth Amendment standard. We address each of the individual Defendant's arguments below.

### 1. Jesse Kirsch

Jesse Kirsch is a Physicians Assistant for PrimeCare and was responsible for screening patients who appear at "sick line" and referring patients requiring further diagnostic procedures to a physician. (Pl. State. Facts ¶ 4.) Kirsch first evaluated Plaintiff on May 1, 2006, two days after his injury. He diagnosed Plaintiff with a right ankle sprain and a possible Achilles tendon strain

or partial tear. Kirsch ordered an x-ray of Plaintiff's right heel bone, ordered medication and directed Plaintiff to rest and wrap his ankle with an ace bandage. Kirsch's treatment plan was reviewed and approved by Dr. Drue Wagner of PrimeCare. (Doc. No. 80, Ex. O at 828).

Plaintiff first contends that Kirsch's refusal to refer him to a doctor for a second opinion was deliberately indifferent. Plaintiff testified that he told Kirsch during their initial meeting that "it was more than a sprained ankle" and asked for the second opinion of a doctor. He claims that when he insisted on a second opinion, Kirsch said "you don't need to see the doctor, I went to medical school, I know what I'm talking about." The record reflects, however, that Kirsch was responsive to Plaintiff's request, if not immediately, and twice referred him to Dr. Von Kiel.[9] While Plaintiff would have preferred an immediate referral, his disagreement with the way in which his treatment was handled does not give rise to an Eighth Amendment violation.[10] Given Kirsch's initial impression of Plaintiff's injury, we are unable to conclude that the evidence of record supports a reasonable inference that Kirsch knew of, and recklessly disregarded, a significant risk to Plaintiff's health when he initially refused to refer him to the prison doctor.

Plaintiff also contends that Kirsch was deliberately indifferent for failing to order further diagnostic testing of his right ankle following an x-ray report of May 4, 2006, which suggested an MRI, "[i]f there is a concern regarding an Achilles tear and further imaging is required[.]" (Doc.

---

[9] At Plaintiff's request, Kirsch referred Plaintiff to Dr. Von Kiel on May 16, 2006. On June 1, 2006, after learning that Plaintiff was in pain and had still not seen a doctor, Kirsch again referred Plaintiff to Dr. Von Kiel for a second opinion. Id., Ex. O at 828-29, 832; (Kirsch Depo. pp. 266-69).

[10] Lanzaro, 834 F.2d at 346; see Featherstone v. Lowe, 2006 WL 3484296 at **2-3 (M.D.Pa. Nov. 30, 2006) (holding, at motion to dismiss stage, averment that doctor refused to increase medication, order an MRI, and refer him for a second opinion was insufficient to state a constitutional claim).

No. 80, Ex. Q.)  The Eighth Amendment, however, is not a device to second guess the medical decisions of prison personnel.  Indeed, the "[q]uestion of whether an X-ray or additional diagnostic techniques or forms of treatment . . . is a classic example of a matter of medical judgment.  A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."  Estelle v. Gamble, 429 U.S. 97, 107 (1976).

Following Plaintiff's initial x-ray, Kirsch evaluated Plaintiff on May 5, 2006 and again on May 16, 2006.  On May 16, he noted that Plaintiff was "doing well" and diagnosed him with a "resolving Achilles strain / ? partial tearing."  (Doc. No. 80, O at 828.)  At Plaintiff's request, Kirsch referred him to Dr. Von Kiel for a second opinion.  While it may have been preferable for Kirsch to order an MRI, rather than resuming his initial treatment plan and referring him to Dr. Von Kiel, his failure to do so does not support a finding of deliberate indifference.

Lastly, Plaintiff asserts that Kirsch was deliberately indifferent for continuing him along a less effective and easier course of treatment, despite knowing his injury was more serious than initially diagnosed.  Plaintiff specifically points to Kirsch's failure to prescribe him "crutches, a cane, or any other device[.]"  (Pl. Br., Doc. No. 80, at 13-14.)  However, Kirsch did not know the extent of Plaintiff's injury until July 4, 2006, when he evaluated Plaintiff and reviewed his MRI of July 3, 2006.  At the time of Kirsch's evaluation, Dr. Von Kiel had already directed that Plaintiff be provided a "brace-device currently available to inmates[.]"  (Doc. No. 80, Ex. Z, O at 834-36.)  Kirsch ordered that Plaintiff be moved to the lower tier of his prison unit, ordered medication, and referred him to orthopedic specialist, Dr. Martinez, for a follow-up visit.  On July 13, 2006, Kirsch also prescribed Plaintiff medication and noted that he was scheduled to see Dr. Martinez on July 17, 2006.

The record reflects that Kirsch did not evaluate Plaintiff again until August 24, 2006. By this time, Dr. Martinez had determined that it was "too late to put [Plaintiff] in a brace" and proposed surgery as an option. Indeed, as of Kirsch's August 24, 2006 evaluation, Plaintiff had visited surgical specialist, Dr. Thomas Shannon.

In light of Kirsch's treatment of Plaintiff and the surrounding circumstances of Plaintiff's care, we conclude that there are not sufficient facts to establish that he failed to exercise his professional judgment and was deliberately indifferent for failing to prescribe crutches, a cane or a similar device.[11] (Doc. No. 80, Ex. O at 834-36.) Ultimately, Plaintiff's claim against Kirsch rests on his disagreement with the way in which Kirsch participated in his care in July and August 2006. There is insufficient evidence to reasonably conclude that, during Kirsch's three evaluations of Plaintiff during this period, he refused to provide Plaintiff medical care, delayed his treatment for non-medical reasons, or prevented him from receiving recommended care. See Durmer v. O'Carroll, 991 F.2d 64, 67-68 (3d Cir. 1993).

### 2. Dr. Drue Wagner

Dr. Drue Wagner was the Assistant Corporate Director for PrimeCare at Berks County Prison from August 3, 2005 until May 4, 2006. He was responsible for supervising the clinical services provided at the facility as well as treating patients. (Pl. State. Facts ¶ 1.) Dr. Wagner never personally evaluated Plaintiff, but on May 4, 2006, his last day of work at PrimeCare, he reviewed

---

[11] See White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) (directing that an inmate's disagreements with medical treatment provided is not sufficient to support an Eighth Amendment claim); Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) ("Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [w]hich remains a question of sound professional judgment"). Cf. Williams v. Kort, 223 Fed.App'x 95, 100-01 (3d Cir. 2007).

Kirsch's initial observations and treatment plan. Dr. Wagner testified that Kirsch's "work up and evaluation . . . were excellent" and that his treatment plan was "perfect." (Wagner Depo. pp. 33, 46-48.) Specifically, he claimed that "[y]ou're not thinking about anything other than conservative care for what looks like a strained injury. You're going to give it time and that's what [Kirsch's] plan was and I couldn't -- I wouldn't do any different."[12] Id. at 48.

Plaintiff claims that Dr. Wagner was deliberately indifferent because he approved Kirsch's treatment plan on May 4, 2006, even though the plan did not call for an MRI or a medical device, such as crutches or a cane, to prevent further aggravation of his injury. (Pl. Br., Doc. No. 80, at 20-21.) At most, however, Dr. Wagner's failure to refine Kirsch's approach constituted negligence or medical malpractice, and therefore does not support an Eighth Amendment violation.[13]

### 3. Paula Dillman-McGowan

Paula Dillman-McGowan is a Certified Nurse Practitioner for PrimeCare, who is authorized to diagnose, evaluate and prescribe medication to patients. Her duties include screening the medical complaints of inmates and referring those requiring further attention to a physician. (Pl. State. Facts ¶ 3.) Plaintiff contends that she exhibited deliberate indifference when she denied him access to a physician, failed to ensure that he received a prescribed brace, and failed to provide necessary

---

[12] Dr. Wagner noted that it was "very clear from [Kirsch's] documentation that the Achilles tendon [was] intact, and in that setting, you're simply going to give him time to heal," and given there was evidence of ankle injury it was appropriate to "[g]et an X-ray . . . [to] make sure that there's no evidence of a fracture[.]" (Wagner Depo. pp. 46-47.)

[13] Plaintiff further contends that Wagner should have recognized that Kirsch's prescription of an ace bandage and over-the-counter pain medication did not constitute treatment at all for a torn Achilles tendon. (Pl. Br. at 20.) It is undisputed, however, that Plaintiff was not diagnosed with an Achilles tendon tear as of May 4, 2006, when Dr. Wagner reviewed his file. We, therefore, reject Plaintiff's argument that the treatment provided constitutes no treatment at all, so as to support a finding of deliberate indifference.

treatment. (Pl. Br., Doc. No. 80, at 17-20.)

Plaintiff's first argument is based upon Dillman-McGowan's failure to refer him to a physician in May 2006, even though he informed her that Kirsch refused to refer him for a second opinion. Plaintiff also points to the "sick call requests" he sent to her on May 5 and May 15, 2006, repeating his need to see a physician. We conclude that there is insufficient evidence to allow a reasonable jury to conclude that Dillman-McGowan was deliberately indifferent based on these facts. Plaintiff was receiving treatment for his injury during this period, which was approved by Dr. Wagner. Further, in response to Plaintiff's May 15, 2006 request, Dillman-McGowan noted that he was seen by Kirsch on May 16, 2006 and was "scheduled to see physician [on] 5/17/06[.]" (Doc. No. 80, Ex. T; Dillman-McGowan Depo. pp. 66-68.) While Plaintiff did not ultimately see a physician until June 5, 2006, Dillman-McGowan's failure to follow-up on the status of his scheduled visit does not amount to a constitutional violation, especially considering that she was not yet aware of the extent of his injury. See Johnson v. Stempler, 2005 WL 119575 at **4-5 (E.D.Pa. Jan. 20, 2005).

Plaintiff next claims that Dillman-McGowan exhibited deliberate indifference when she failed to ensure that he received a cast walker brace prescribed by Dr. Martinez. See (Doc. No. 80, Ex. V, W.) On June 21, 2006, after his initial visit with Dr. Martinez, Plaintiff met with Dillman-McGowan for a follow-up appointment and she filled out the necessary paperwork to provide Plaintiff with the prescribed brace. See Id.; (Doc. No. 80, Ex. O at 831; Dillman-McGowan Depo. pp. 78-83; Pl. State. Facts ¶ 30.) Defendant, Cynthia Sheldon, however, did not order the brace and Plaintiff was not provided a similar device to immobilize his ankle.

On August 3, 2006, Dillman-McGowan evaluated Plaintiff in his cell. Plaintiff testified that

when he asked her about his brace, she told him "[t]hat it wasn't her job to give to [him], but she agreed well you do need a brace, but she said when you get it, you'll get it, try to hang in there." (Turner Depo. p. 114); see (Doc. No. 80, Ex. O at 837.) She did not evaluate Plaintiff again until September 7, 2006 when he complained of an upset stomach due to his medication. Id. at 841. Following these visits, Dillman-McGowan did not attempt to obtain the prescribed brace or inquire as to the status of the brace.

Plaintiff claims that this inaction raises a genuine issue of material fact under the Eighth Amendment. We agree. On August 3, 2006, Dillman-McGowan knew that Plaintiff had a partially torn Achilles tendon and that he had been prescribed a brace to immobilize his ankle. Further, accepting Plaintiff's testimony as true, Dillman-McGowan was aware that Plaintiff did not have a brace and thought that he needed one, but did nothing other than to insist that he would "get it." A reasonable factfinder could conclude that her failure to take any action, six weeks after the brace was originally prescribed, constitutes deliberate indifference. While a jury could conclude that it may not have been "her job" to obtain the brace or that Dr. Martinez had since concluded that the brace would no longer be effective, those facts do not necessarily absolve Dillman-McGowan of responsibility under the Eighth Amendment.[14] Cf. Morton v. City of Philadelphia, 2011 WL 536545 at **4-5 (E.D.Pa. Feb. 15, 2011) (denying defendants' summary judgment motion, although defendants claimed that, under the circumstances, other prison doctors were responsible for making sure plaintiff received the appropriate care).

---

[14] On July 26, 2006, Dr. Martinez evaluated Plaintiff and opined that his Achilles tear was now "chronic" and that it was "too late to put him in a brace and/or cast." (Doc. No. 80, Ex. AA.) However, accepting Plaintiff's testimony as true, as of August 3, 2006, Dillman-McGowan was unaware of Dr. Martinez's impression and thought that he still needed a brace.

###### 4. Cynthia Sheldon

Cynthia Sheldon is the Health Services Administrator for PrimeCare, and is responsible for overseeing the work performed at the facility and ordering medical equipment and devices when indicated by prison doctors, physicians assistants or nurse practitioners. She is also operationally responsible and accountable for the medical unit within the facility. Plaintiff contends that Sheldon was deliberately indifferent to his serious medical needs because she failed to order the cast walker brace prescribed by Dr. Martinez. (Pl. State. Facts ¶ 5; Sheldon Depo. pp. 30, 73-74; Von Kiel Depo. p. 27.)

On this point, Sheldon testified that she contacted a medical supply company for the brace, and was told that it "was a specialty brace, that . . . actually has to get fitted" and that she would have to order it through a "specialty supplier." She claims that when she made Dr. Von Kiel aware of this, he told her not to order the brace and that he would "take care of it." Sheldon explained that she followed-up with Dr. Von Kiel, and "saw that, in the chart, that he had ordered . . . crutches." She took no further action, although she "believed [Plaintiff] refused to come to [the] medical [unit] . . . [s]o he couldn't have crutches." (Sheldon Depo. pp. 127-30.)

We conclude that Plaintiff has raised a genuine issue of material fact regarding whether Sheldon was deliberately indifferent to his medical needs. A jury could conclude that Sheldon was aware that Plaintiff was prescribed a specific brace to immobilize his ankle, and was responsible for ordering such equipment. She testified that, as a general matter, once a medical device is prescribed and noted on the appropriate form, she orders it without further discussion with the medical provider. In this case, however, rather than fulfilling Plaintiff's prescription, Sheldon allegedly consulted with Dr. Von Kiel after learning that the brace would have to be ordered from

a speciality supplier, and upon his instruction, never followed-up.[15]

Further, Sheldon testified that Dr. Von Kiel "said he would order crutches and something else[,]" in place of the prescribed brace.[16] She allegedly did nothing, however, despite the fact that she knew that Plaintiff never received a brace or the alternative treatment allegedly proposed by Dr. Von Kiel. See (Sheldon Depo. p. 130.) Under these circumstances, we find that credibility issues exist regarding Sheldon's intent which must be addressed by a jury. (Sheldon Depo. pp. 74, 129-30.) Cf. Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

### 5. Dr. Erik Von Kiel

Dr. Erik Von Kiel replaced Dr. Wagner as the Assistant Corporate Director for PrimeCare in May 2006, and became responsible for clinical management of the medical unit. See (Doc. No. 80, Ex. D.) Plaintiff claims that Dr. Von Kiel exhibited deliberate indifference by preventing him from receiving the cast walker brace prescribed by Dr. Martinez and failing to provide him any alternative treatment. Dr. Von Kiel claims that he exercised his professional judgment and provided Plaintiff "an ace bandage and crutches as a substitute for the cast walker brace[,]" and Plaintiff's disagreement with this decision is not actionable under the Eighth Amendment.[17]

---

[15] Dr. Von Kiel does not recall this conversation. (Von Kiel Depo. p. 114.)

[16] Sheldon's testimony is not entirely clear on this point. She initially testified that when she "made [Dr. Von Kiel] aware that it was a specialty brace and had to be fitted, . . . he said that he would order crutches and something else[.]" However, when she was asked specifically what Dr. Von Kiel said, she responded "[h]e told me not to order [the brace] and he would take care of it." (Sheldon Depo. pp. 129-30.)

[17] (Def. Br., Doc. No. 88, at 4-5) (citing White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1987) ("If a plaintiff's disagreement with a doctor's professional judgment does not state a violation of the Eighth Amendment, then certainly no claim is stated when a *doctor* disagrees with the professional judgment of another doctor. There may, for example, be several acceptable ways to treat an illness") (emphasis in original)).

Plaintiff relies primarily upon Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993). In Durmer, the plaintiff suffered two strokes and was involved in an automobile accident in the months before his incarceration, causing him to lose mobility in his left arm and leg. Id. at 65-66. His treating physician prescribed a comprehensive physical therapy plan to restore movement in his extremities, which, to be effective, needed to be completed within eighteen months. Id. Plaintiff was unable to continue the prescribed therapy during the first six months of his incarceration, but was told that the therapy would be available to him upon transfer to another prison. Shortly after his transfer, plaintiff told the prison physician that he had suffered strokes and needed to resume the course of physical therapy that was prescribed to him.

Rather than instituting the therapy, the prison physician referred plaintiff to two outside neurologists, the first of whom recommended physical therapy. Although plaintiff was ultimately provided access to an electrical device to stimulate his muscles, was referred to a physical therapy specialist, and was prescribed an orthotic device, too much time had elapsed for physical therapy to be effective. Id. at 66-67. The Third Circuit held that "[w]hile a reasonable trier of fact might believe [the doctor's] explanation that [his referral of plaintiff to other physicians was] . . . , in his judgment, medically desirable before beginning physical therapy, it might also reject this explanation as merely a pretext for avoiding physical therapy." Id. at 68. The Court noted that the physician ignored several recommendations for physical therapy, although "time was of the essence," and there was some evidence suggesting that the doctor may have been motivated to avoid the therapy to alleviate the prison from the associated "burden and expense." Id.

Here, Dr. Von Kiel's treatment of Plaintiff could be viewed as similar to that of the physician in Durmer. After June 21, 2006, Dr. Von Kiel was aware that Plaintiff was diagnosed

with a possible Achilles tendon tear and was prescribed a brace to immobilize his ankle. Dr. Martinez noted that, due to the fact that the injury occurred "two months ago or so," he believed that the brace could heal Plaintiff's injury, without surgery. According to Sheldon, Dr. Von Kiel gave her specific directions not to order the brace when he learned that it had to be "fitted" and "specially" ordered, possibly suggesting that non-medical concerns may have motivated the decision of whether or not to order the brace. Further, while Dr. Von Kiel noted that Plaintiff should be given the "brace-device currently available for inmate[s] here now[,]" Plaintiff was never provided a brace of any kind.[18]

When Dr. Von Kiel was apparently made aware that Plaintiff had not yet received a brace, he simply wrote "follow-up with brace per ortho[.]" See (Von Kiel Depo. pp. 132-33; Doc. No. 80, Ex. O at 836.) A jury could conclude that Von Kiel did not take any affirmative steps to ensure Plaintiff's ankle was immobilized. As a result, Plaintiff's injury became progressively worse and surgery was required to attempt to repair his Achilles tendon. See (Doc. No. 80, Ex. AA.) Based upon this evidence, we conclude that a reasonable jury could find that Dr. Von Kiel was deliberately indifferent to Plaintiff's medical needs.[19]

---

[18] See (Doc. No. 80, Ex. O, at 834; Von Kiel Depo. pp. 127-29.)

[19] We also note that, after Dr. Martinez concluded that a cast brace would no longer effectively treat Plaintiff's injury, Dr. Von Kiel initially recommended crutches and medical housing. He discontinued Plaintiff's move to the medical unit on August 3, 2006, however, for reasons not disclosed in Plaintiff's medical records. Von Kiel testified that he "suspects" Plaintiff may have refused to cooperate with a "certain element of the plan." Plaintiff, however, testified that he never refused crutches, or any other medical device, which is somewhat inconsistent with Dr. Von Kiel's testimony. Viewed in a light most favorable to Plaintiff, we conclude a triable issue of fact exists as to why Plaintiff was denied medical housing, crutches and any alternative treatment. (Von Kiel Depo. p. 145; Turner Depo. pp. 121, 173).

### 6.     Joetta Kline

Joetta Kline worked as an office clerk for PrimeCare.  She reported directly to Defendant, Cynthia Sheldon, and her duties included "typing, answering phones, setting up schedules, payroll," and other administrative tasks.  (Kline Depo. pp. 8, 14, 43; Pl. State. Facts ¶ 6.)  Plaintiff contends that Kline was deliberately indifferent to his medical needs because she rescheduled his follow-up appointment with Dr. Martinez due to a transportation issue, and neglected to respond to a fax from Berks Foot & Ankle Surgical Associates, effectively delaying his surgery for over six weeks.  (Pl. Br., Doc. No. 80, at 21.)

Plaintiff has failed to adduce evidence that Kline was deliberately indifferent when she rescheduled his follow-up appointment with Dr. Martinez from July 17, 2006 to July 24, 2006. (Doc. No. 80, Ex. O at 835-36.)  Kline is not a medical professional and there is no indication that she understood the seriousness of Plaintiff's medical condition or the impact a delay might have on him.  See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).  Thus, while Plaintiff is correct in noting that Kline rescheduled his appointment for non-medical reasons, without evidence that she did so in reckless disregard to Plaintiff's health, it cannot be demonstrated that she violated Plaintiff's constitutional rights.[20]

Further, even if we were to accept that the record supported an inference that Kline knew of the risks associated with his condition, Plaintiff has nevertheless failed to raise a genuine issue of fact under the Eighth Amendment.  A one week delay for a follow-up appointment with an

---

[20] See Farmer, 511 U.S. at 837-38 (holding that a subjective finding of recklessness is required and that "an official['s] failure to alleviate a significant risk that [he or she] should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment"); Latona v. Prison Health Services Inc., 397 Fed.App'x 807, 810-11(3d Cir. 2010).

outside specialist, attributable to a transportation issue, is simply insufficient to support a constitutional violation, particularly where Plaintiff was subject to an ongoing course of treatment at the time. See Gandy v. Correctional Medical Services, Inc., 2007 WL 1038580 at *5 (D.N.J. Mar. 29, 2007) ("Plaintiff would have the Court read broadly the proscription against delaying medical treatment for non-medical reasons. Prisoners are entitled to adequate care, not the best and most timely care possible, therefore the Court will not entertain the notion that any delay for non-medical reasons is constitutionally suspect") (citations omitted)). Cf. Wesley v. Murphy, 2010 WL 2736943 at *4 (E.D.Pa. Jul. 12, 2010) ("[O]ne-week delay in provision of one of three prescription eye-drops to plaintiff, and the substitution of a lower dosage of solution for several more weeks, does not constitute deliberate indifference").

We also conclude that a reasonable jury would be unable to find that Kline's failure to respond to a fax from Berks Foot & Ankle Surgical Associates constitutes deliberate indifference.[21] The fax, dated August 24, 2006, provided that Plaintiff "will be scheduled for surgical repair of his right Achilles tendon[,]" set out the costs of the procedure, and noted that Dr. Shannon was "looking at a tentative date of 09/13/06 for [Plaintiff's] surgery[.]" (Doc. No. 80, Ex. DD.) There is simply nothing in the record to suggest that Kline understood the nature of Plaintiff's injury and

---

[21] Plaintiff also claims that Defendants, Cynthia Sheldon and Dr. Erik Von Kiel were deliberately indifferent for failing to respond to the fax of August 24, 2006. He has not provided, however, any evidence that suggests either of these Defendants were personally involved in the handling of this fax or that either of them were aware of it. Further, to the extent Plaintiff is attempting to hold them responsible for the alleged acts or omissions of Joetta Kline, his claim must fail. Claims pursuant to 42 U.S.C. § 1983 may not be premised upon respondeat superior. See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (reflecting that personal involvement is required, which "can be shown through allegations of personal direction or of actual knowledge and acquiesce"). There is simply insufficient evidence to support a finding that Dr. Von Kiel or Sheldon were deliberately indifferent in this respect.

intentionally ignored this fax in reckless disregard of his health.  Indeed, Kline scheduled Plaintiff's surgery for September 28, 2006, two weeks after Dr. Shannon noted he was first available. <u>See</u> (Doc. No. 80, Ex. O at 842); <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-06 (1976) (directing that inadvertence or negligence does not support an Eighth Amendment violation).

## IV.    CONCLUSION

For the foregoing reasons, summary judgment is granted with respect to Defendants Jesse Kirsch, Drue Wagner and Joetta Kline.  Summary judgment is denied, however, with respect to Defendants Paula Dillman-McGowan, Cynthia Sheldon and Erik Von Kiel.

Our Order follows.